# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

DYLAN BEGIN,
*Plaintiff,*

v.

No. 3:21-cv-1329 (VAB)

BECTON, DICKINSON & CO.,
*Defendant.*

## RULING AND ORDER ON MOTION FOR SUMMARY JUDGMENT

Dylan Begin ("Plaintiff") has sued his former employer, Becton, Dickinson & Co. ("Becton" or "Defendant"), for disability discrimination under the Connecticut Fair Employment Practices Act ("CFEPA"). Ex. A to Notice of Removal, ECF No. 1 ("Compl."). Mr. Begin alleges that he was terminated because of his morbid obesity, that Becton failed to accommodate his disability, and that Becton retaliated against him for requesting an accommodation. *See id.*

Becton has moved for summary judgment on all claims, arguing that Mr. Begin is not disabled under CFEPA and that he has not presented sufficient evidence to raise an inference of discrimination. *See* Def.'s Mot. for Summ. J., ECF No. 29.

For the following reasons, Becton's motion for summary judgment is **GRANTED**.

The Clerk of Court is respectfully directed to enter judgment in favor of Becton and to close this case.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Background

Becton, Dickinson & Co. is a medical technology company that, among other things, produces medical devices. *See* Def.'s Mem. of Law in Supp. of its Mot. for Summ. J. at 3–4, ECF No. 29-1 ("Mem."). In May 2019, Becton hired Mr. Begin as a Senior Molding Process

Technician at their facility in Canaan, Connecticut. *See* Answer ¶¶ 7–8, ECF No. 13. As a Senior

Molding Process Technician, Mr. Begin was responsible for "the technical aspects of the

molding operation," which included coordinating mold repairs in order to improve mold cavity

utilization. *See* Ex. E to Vidal Aff., ECF No. 29-4 at 35 ("Position Description"); Ex. 1 to Pl.'s

Obj. to Def.'s Mot. for Summ. J. at 54:20–56:17, ECF No. 34-4 ("Begin Dep."). Mr. Begin was

interviewed and hired by Michael Vidal, who became Mr. Begin's supervisor. *See* Pl.'s L. R.

56(a)2 Statement ¶ 6, 9, ECF No. 34-2 ("Pl.'s SMF").

   Mr. Begin's medical records indicate that, as of 2019, he suffered from morbid obesity

that had begun twenty years ago. *See* Ex. 9 to Pl.'s Obj. to Def.'s Mot. for Summ. J. at 9, ECF

No. 34-12 ("FCB Medical Records").[1] At the time of his interview with Mr. Vidal, Mr. Begin

weighed approximately 300 pounds, and the two met in person for the interview. *See id.* ¶7. In

his deposition testimony, Mr. Begin stated that his weight may have interfered with his ability to

reach a part of Becton's older machines. *See* Begin Dep. at 60:5–21 ("Q. Did reaching the bolt

have anything to do with your weight or just the length of your arm? A. It was probably a

combination of both."). Mr. Begin did not, however, request any accommodation related to this

---

[1] Becton argues that the Court should disregard Mr. Begin's assertion that his morbid obesity began twenty years earlier because he fails to cite any support for this assertion and fails to authenticate the medical documentation he provides. *See* Def.'s Reply in Further Supp. of its Mot. for Summ. J. at 1–2, ECF No. 39. Although Becton is correct that Mr. Begin failed to provide a citation for this proposition in his statement of material facts, medical records from an appointment on August 16, 2019, state that Mr. Begin suffered from "Morbid Obesity" that "[o]nset 20 years ago." FCB Medical Records at 1. And while Becton points out that these medical records are purportedly authenticated only by an affidavit submitted by Mr. Begin's attorney, the Second Circuit has noted that "the exclusion of otherwise relevant evidence on technical grounds is generally not favored." *Rodriguez v. Vill. Green Realty, Inc.*, 788 F.3d 31, 47 (2d Cir. 2015) (quoting *Cargill, Inc. v. Sears Petroleum & Transp. Corp.*, 334 F. Supp. 2d 197, 247 (N.D.N.Y. 2004)). Ordinarily, plaintiffs should be given the opportunity to respond when defendants challenge documents that "seem like the type that likely could have been authenticated." *Id.*; *see also H. Sand & Co. v. Airtemp Corp.*, 934 F.2d 450, 454 (2d Cir. 1991) (stating that Rule 56 "does not . . . require that parties authenticate documents where [the non-offering party] did not challenge the authenticity of the documents"). Ultimately, because the Court concludes that Mr. Begin's evidence does not preclude summary judgment, the Court will assume that these medical records are admissible.

limitation, nor did he identify any other way in which his weight interfered with his ability to do his job on a daily basis. *See* Pl.'s SMF ¶ 14.[2]

On July 25, 2019, Mr. Begin sent an e-mail to Mr. Vidal in which Mr. Begin noted that he was struggling and requested more in-depth training. *See id.* ¶ 15. Mr. Vidal responded the same day, advising Mr. Begin that he planned to address Mr. Begin's concerns about training, telling Mr. Begin not to "stress about it," and noting, "I was under the impression you were doing well based on the feedback I'm getting!" Pl.'s Additional Material Facts ¶ 3, ECF No. 34-2 at 12 ("Pl.'s AMF"); Ex. 2 to Pl.'s Obj. to Def.'s Mot. for Summ. J., ECF No. 34-5 ("July 25 E-Mail").

On August 1, 2019, Mr. Vidal sent an e-mail to Mr. Begin criticizing the cleanliness of the presses for which Mr. Begin was responsible. *See* Pl.'s SMF ¶ 16; Ex. F to Vidal Aff., ECF No. 29-4 at 41 ("Press Cleanliness E-Mail"). Mr. Begin responded that "the purge was still hot that's why that was left but I have no excuse for the parts [and] that is 100% on me." Press Cleanliness E-Mail. The same day, Mr. Vidal sent another e-mail to Mr. Begin and other staff members in which he faulted Mr. Begin for the injection set-up of a particular press, pointed out that "[m]aintaining molded component flow is our job, as is communicating issues and arranging for the correct resources to troubleshoot and correct issues," and noted that "[b]efore anything is done Friday morning this needs to be addressed." Pl.'s SMF ¶ 17.

On August 22, 2019, Mr. Vidal sent an e-mail to Mr. Begin regarding another press, writing, "Dylan, the parts containment on this press is not acceptable and this issues [sic] needs to be addressed ASAP." *Id.* ¶ 18.

---

[2] Mr. Begin denies Becton's statement that he never requested an accommodation based on his weight, but he disputes this assertion only by pointing to his request for medical leave related to his bariatric surgery. *See* Pl.'s SMF ¶ 14; Pl.'s Additional Material Facts ¶ 2, ECF No. 34-2 at 12 (identifying only the medical leave request as a requested accommodation).

On September 2, 2019, Mr. Begin notified Mr. Vidal that he had suffered an injury outside of work and had not been cleared by his physician to return to work. *See id.* ¶ 21; Ex. 6 to Def.'s Mot. for Summ. J., ECF No. 29-8 ("Text Messages"). Mr. Vidal advised Mr. Begin that he should apply for a medical leave of absence, and Becton later approved Mr. Begin's request for medical leave. *See* Pl.'s SMF ¶¶ 21, 23.[3]

Mr. Begin returned to work on October 1, 2019. *See id.* ¶ 24. On October 8, 2019, Mr. Vidal conducted Mr. Begin's probationary period review.[4] Mr. Vidal informed Mr. Begin that his probationary period would continue and that he would have monthly performance reviews going forward. *See id.* ¶¶ 25–26. On October 25, 2019, Mr. Begin sent an e-mail to Mr. Vidal acknowledging that he was struggling with certain aspects of the work and expressing his belief that he would eventually become proficient. *See id.* ¶ 27. On October 30, 2019, Mr. Vidal conducted a walkthrough of Mr. Begin's work area and later sent Mr. Begin an e-mail noting some opportunities for Mr. Begin to improve his organization. *See id.* ¶ 28; Ex. J to Vidal Aff., ECF No. 29-4 at 58 ("October 31 E-Mail").

On November 6, 2019, Mr. Begin notified Mr. Vidal that he was planning to take a leave of absence to have bariatric surgery. *See* Pl.'s SMF ¶ 29.

---

[3] Mr. Begin does not argue that this injury and leave of absence were related to his asserted disability.

[4] As a new employee, Mr. Begin was subject to a ninety-day probationary period. *See* Ex. D to Vidal Aff., ECF No. 29-4 at 33. During this probationary period, employees typically were not permitted to take vacation or leaves of absence. *See id.* Because he started working in May 2019, Mr. Begin's probation period ordinarily would have ended in August 2019. *See* Pl.'s SMF ¶ 13. Becton asserts that Mr. Vidal decided in August to extend Mr. Begin's probationary period by another ninety days. *See* Def.'s L. R. 56(a)1 Statement of Undisputed Material Facts ¶ 19, ECF No. 29-2. Mr. Begin, however, believed his probationary period had ended in August and stated that he was only told in October that he remained subject to the probationary policy. *See* Begin Dep. at 116:23–117:7. In an e-mail Mr. Vidal sent to his supervisor summarizing Mr. Begin's probationary period review, Mr. Vidal stated that the review was given late due to Mr. Begin's injury-related medical leave. *See* Ex. I to Vidal Aff., ECF No. 29-4 at 55. Regardless of when the decision was made, the parties agree that Mr. Begin remained a probationary employee after his probationary period review on October 8, 2019. *See* Pl.'s SMF ¶ 26.

On November 12, 2019, after conducting Mr. Begin's monthly performance review, Mr. Vidal sent an e-mail to Business Unit Manager Glenn Boswell and Human Resources Manager Craig Sullivan to advise them that Mr. Begin was unprepared for the review and that his performance remained below expectation levels. *See id.* ¶¶ 30–31.

On November 18, 2019, Mr. Vidal sent an e-mail to human resources personnel to initiate the process of terminating Mr. Begin. *See id.* ¶ 33. On November 26, 2019, Mr. Vidal and the human resources staff decided to terminate Mr. Begin after he returned from his December 2019 bariatric surgery leave of absence. *See id.* ¶ 34.

On December 4, 2019, Mr. Vidal conducted a monthly review with Mr. Begin, after which he noted that Mr. Begin's performance had not sufficiently improved. *See id.* ¶ 35. Mr. Vidal then sent an e-mail to human resources staff to confirm that Mr. Begin would be terminated after his December leave of absence. *See id.*

Mr. Begin's leave of absence began on December 5, 2019, and he returned to work on December 31, 2019. *See id.* ¶ 36. On January 2, 2020, approximately eight months after Mr. Begin was hired, Mr. Vidal notified Mr. Begin that he had been terminated. *See id.* ¶¶ 37, 40.

On July 6, 2020, Mr. Begin filed a charge with the Connecticut Commission on Human Rights and Opportunities ("CHRO"). *See id.* ¶ 43.

### B.  Procedural History

On September 7, 2021, after obtaining a release of jurisdiction from the CHRO, Mr. Begin filed his Complaint in Connecticut Superior Court. Compl.

On October 7, 2021, Becton removed the action to federal court based on diversity jurisdiction. Notice of Removal, ECF No. 1.

On November 15, 2021, Becton filed an Answer to Mr. Begin's Complaint. Answer.

On November 22, 2021, the parties filed a Rule 26(f) Report, Report of Rule 26(f) Planning Meeting, ECF No. 14, and the Court issued a scheduling order the next day, Order, ECF No. 15.

On February 15, 2023, Becton filed a motion for summary judgment. Def.'s Mot. for Summ. J.

On April 25, 2023, after obtaining an extension of time from the Court, Mr. Begin filed his opposition to Becton's motion for summary judgment. Pl.'s Obj. to Def.'s Mot. for Summ. J., ECF No. 34; Pl.'s Mem. of Law in Supp. of Obj. to Mot. for Summ. J., ECF No. 34-1 ("Opp'n").

On June 22, 2023, after also receiving an extension of time from the Court, Becton filed its reply. Def.'s Reply in Further Supp. of its Mot. for Summ. J., ECF No. 39 ("Reply").

## II.     STANDARD OF REVIEW

A court will grant a motion for summary judgment if the record shows no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The non-moving party may defeat the motion by producing sufficient evidence to establish that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247–48.

"[T]he substantive law will identify which facts are material." *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*; *see Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir.

1996) ("[M]ateriality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law." (citing *Anderson*, 477 U.S. at 248)).

"The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. When a motion for summary judgment is supported by documentary evidence and sworn affidavits and "demonstrates the absence of a genuine issue of material fact," the non-moving party must do more than vaguely assert the existence of some unspecified disputed material facts or "rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (internal quotation marks omitted).

The party opposing the motion for summary judgment "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id.* (internal quotation marks omitted). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 250 (citing *Dombrowski v. Eastland*, 387 U.S. 82, 87 (1967); and *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968)).

A court must view any inferences drawn from the facts in the light most favorable to the party opposing the summary judgment motion. *See Dufort v. City of New York*, 874 F.3d 338, 343, 347 (2d Cir. 2017) ("On a motion for summary judgment, the court must 'resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought.'"). A court will not draw an inference of a genuine dispute of material fact from conclusory allegations or denials, *see Brown v. Eli Lilly & Co.*, 654 F.3d 347,

7

358 (2d Cir. 2011), and will grant summary judgment only "if, under the governing law, there can be but one reasonable conclusion as to the verdict," *Anderson*, 477 U.S. at 250.

## III.    DISCUSSION

Mr. Begin asserts three separate CFEPA claims: (1) disability discrimination; (2) failure to accommodate; and (3) retaliation.

The Court will address the disability discrimination and retaliation claims together, as they are analyzed under the same framework.

### A.  The Disability Discrimination and Retaliation Claims

Under CFEPA, an employer may not "discharge from employment any individual or to discriminate against any individual in compensation or in terms, conditions or privileges of employment" because of that individual's race, religion, age, sex, gender identity, disability, or other protected characteristic. Conn. Gen. Stat. § 46a-60(b)(1). Here, Mr. Begin alleges that Becton terminated him because of his physical disability, morbid obesity. *See* Compl. ¶¶ 40–44. He further claims that his termination was retaliation for his request to take a leave of absence to have bariatric surgery. *See id.* ¶¶ 49–52.

These claims are analyzed under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), for parallel federal claims under Title VII. *See Bentley v. AutoZoners, LLC*, 935 F.3d 76, 88 (2d Cir. 2019); *see also Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 556 (2d Cir. 2010) ("The analysis of discrimination and retaliation claims under CFEPA is the same as under Title VII.").

> Under *McDonnell Douglas,* the plaintiff bears the initial burden of establishing a prima facie case of discrimination. Once this burden is met, the defendant must then articulate some legitimate, nondiscriminatory reason for its action. The defendant need not persuade the court that it was actually motivated by the proffered reason[]. It is sufficient if the defendant's evidence raises a genuine

> issue of fact as to whether it discriminated against the plaintiff.
> When the employer meets its burden, the plaintiff can no longer rely
> on the prima facie case, but must prove that the employer's proffered
> reason was a pretext for discrimination.

*Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 168 (2d Cir. 2014) (alteration in original) (internal

quotation marks and citations omitted).

Becton argues that Mr. Begin cannot establish a *prima facie* case of discrimination and

that, even if he could, he cannot establish that Becton's legitimate reason for terminating him

was pretextual. *See* Mem. at 14, 21.[5]

The Court will address each of these arguments in turn.

### 1. *Prima Facie* Case

To make out a *prima facie* case of discrimination, a plaintiff must show "(1) that [he] is a

member of a protected class, (2) that [he] was qualified for the position she sought, (3) that [he]

suffered an adverse employment action, and (4) can sustain a *minimal* burden of showing facts

suggesting an inference of discriminatory motivation." *Littlejohn v. City of New York*, 795 F.3d

297, 311 (2d Cir. 2015). The evidence required to establish a *prima facie* case "has been

characterized as '*de minimis*.'" *Wanamaker v. Town of Westport Bd. of Educ.*, 11 F. Supp. 3d 51,

72 (D. Conn. 2014) (quoting *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010)).

Becton argues that Mr. Begin cannot satisfy the first or fourth elements of his *prima facie*

burden. The company argues that obesity qualifies as a protected disability only when it is the

result of an underlying physiological condition and points out that Mr. Begin has not identified

any such underlying condition. *See* Mem. at 15–16. Becton also contends that Mr. Begin's

---

[5] Becton also argues that Mr. Begin has not exhausted his retaliation claim because his CHRO complaint does not sufficiently allege retaliation, as opposed to disability discrimination. *See* Mem. at 24–25. Mr. Begin does not respond to this argument. Because the Court will grant Becton's motion for summary judgment on other grounds, the Court need not reach this issue.

obesity does not qualify as a disability because he has not pointed to any physical symptoms related to obesity that impacted his work on a consistent basis. *See id.* at 16.

Becton further argues that Mr. Begin has not presented sufficient facts to raise an inference of discriminatory motivation. It notes that Mr. Vidal was aware of Mr. Begin's obesity before Mr. Vidal hired him, which suggests that Mr. Vidal was unlikely to fire Mr. Begin less than a year later based on this asserted disability. *See id.* at 17–18. Becton contends that its discipline of Mr. Begin began shortly after he was hired and that Mr. Begin has not presented any evidence showing that he was treated less favorably than non-disabled employees. *See id.* at 19–20.

In response, Mr. Begin argues that he is a member of a protected class because his morbid obesity meets the statutory definition of a chronic handicap, infirmity, or impairment. *See* Opp'n at 9–11. He contends that his obesity has been ongoing for twenty years and that it affected his work by causing him to miss time to undergo bariatric surgery. *See id.*

As to the circumstances of his termination, Mr. Begin argues that the temporal proximity between his request for medical leave and his termination raise an inference of discrimination. *See id.* at 13. Mr. Begin also contends that Mr. Vidal's inconsistent assessments of Mr. Begin's performance suggests an underlying discriminatory motivation for Mr. Begin's termination. *See id.* at 11. According to Mr. Begin, Mr. Vidal's criticism of his work increased in frequency after Mr. Begin requested leave for his bariatric surgery, and Mr. Vidal blamed Mr. Begin for problems that were outside of Mr. Begin's control. *See id.* at 14–15. Mr. Begin further argues that Mr. Vidal's decision to hire Mr. Begin does not negate an inference of discrimination because Mr. Vidal was not aware at the time that Mr. Begin's obesity would affect his work. *See id.* at 14. Thus, Mr. Begin argues that he has made out a *prima facie* case of discrimination.

10

The Court agrees, in part.

A plaintiff qualifies as physically disabled under CFEPA if he "has any chronic physical handicap, infirmity or impairment, whether congenital or resulting from bodily injury, organic processes or changes or from illness." Conn. Gen. Stat. § 46a-51(15). This definition of physical disability is broader than the one provided in the federal Americans with Disabilities Act ("ADA"), which defines "disability" as "a physical or mental impairment that constitutes or results in a substantial impediment to employment." 29 U.S.C. § 705; *see also Beason v. United Techs. Corp.*, 337 F.3d 271, 278 (2d Cir. 2003) (holding that "the CFEPA's definition of physical disability is broader than the ADA's"). Thus, even though Connecticut courts often look to "federal precedent concerning employment discrimination for guidance in enforcing [their] own anti-discrimination statutes," *Levy v. Comm'n on Hum. Rts. & Opportunities*, 236 Conn. 96, 103 (1996), the CHRO has noted that "[C]FEPA, unlike the ADA, does not require the complainant to prove that she is substantially limited in a major life activity," *Beason*, 337 F.3d at 278 (alteration in original) (quoting *CHRO ex rel. Kowalczyk v. City of New Britain*, CHRO No. 9810482, at *25–26 (Mar. 15, 2002)).

Here, Mr. Begin presents evidence showing that his morbid obesity began twenty years before the events at issue in this litigation and that he suffered from sleep apnea, hypertension, gastroesophageal reflux disease, and irritable bowel syndrome. *See* Medical Records at 9–10; Begin Dep. at 118:25–119:2 ("[D]id you have any other symptoms related to morbid obesity? A. Sleep apnea."). Mr. Begin's leave of absence for bariatric surgery was directly related to this asserted disability. *See* Pl.'s AMF ¶ 2.[6]

---

[6] The record also shows that Mr. Begin's morbid obesity, combined with the length of his arms, made it harder for him to reach a particular part of Becton's older machines. *See* Begin Dep. at 60:5–21. Mr. Begin, however, has not presented evidence showing that he requested an accommodation related to this limitation or that this limitation

This evidence may be sufficient to show that Mr. Begin's morbid obesity qualifies as a "chronic physical handicap, infirmity or impairment." Connecticut courts do not appear to have considered the circumstances under which obesity may qualify as a physical disability.[7] Nonetheless, the Connecticut Supreme Court has construed CFEPA's definition of disability broadly in other contexts. In *Jackson v. Water Pollution Control Auth.*, 278 Conn. 692 (2006), the court held that the plaintiff had presented sufficient evidence of disability to support a jury verdict when the plaintiff's uncontroverted testimony showed that he had suffered a right knee injury that required surgery, was given a disability rating for his knee, later suffered a strained lower lumbar spine, and, as a result of these injuries, "experienced continuing discomfort." *See id.* at 703. The court's discussion did not indicate that the plaintiff needed to show that his injuries chronically impaired his ability to perform his job, and the court appeared to regard "continuing discomfort" from past injuries as sufficient to show that the plaintiff's "infirmity" was "chronic." *See id.* In another case, the Connecticut Supreme Court concluded that hypertension qualified as a physical disability because a physician's letter stated that the plaintiff's hypertension "had become a serious problem in recent months" and because the

---

[7] contributed to the negative feedback that he received from Mr. Vidal. Instead, Mr. Begin focuses on the request for bariatric surgery leave as the purported motivating factor behind his termination. *See* Opp'n at 13 (asserting that Mr. Vidal's criticisms of Mr. Begin "became a regular occurrence" only after Mr. Begin requested to take a leave of absence for his bariatric surgery and arguing that the temporal proximity between Mr. Begin's request for leave and his termination supports an inference of discrimination). Thus, the Court will not consider Mr. Begin's difficulty in reaching parts of some machines in determining whether Mr. Begin was disabled or whether Becton decided to terminate him because of this asserted disability.

[7] Becton cites numerous cases holding that obesity cannot qualify as a disability under the ADA unless it is caused by a physiological disorder or condition. *See* Mem. at 15 (citing, *inter alia*, *Francis v. City of Meriden*, 129 F.3d 281, 286 (2d Cir. 1997)). But none of the cited cases addressed whether this rule also applies under CFEPA's broader definition of physical disability. *See Connor v. McDonald's Rest.*, No. 3:02-cv-382 (SRU), 2003 WL 1343259, at *5 (D. Conn. Mar. 19, 2003) (noting without deciding the question of whether, "under Connecticut law, Connor must prove that his morbid obesity is linked to a physiological impairment").

plaintiff had taken a two-week medical leave of absence from work because of his hypertension. *See Adriani v. Comm'n on Hum. Rts. & Opportunities*, 220 Conn. 307, 314 n.7 (1991).

Based on these precedents, the Court may be able to predict that Mr. Begin's decades-old morbid obesity diagnosis, his sleep apnea and other obesity-related symptoms, and his leave of absence for bariatric surgery are sufficient to show that he is physically disabled under the terms of CFEPA.[8] But because the Court will grant Becton's motion for summary judgment on other grounds, the Court need not resolve this uncertain question of state law. Thus, the Court will assume without deciding that Mr. Begin is physically disabled under CFEPA.

Similarly, the Court will assume without deciding that Mr. Begin has presented sufficient evidence to raise an inference of discrimination. The plaintiff's burden of production to raise such an inference is "*de minimis*," *Hicks*, 593 F.3d at 166, and courts have often found that temporal proximity between protected activities and the adverse employment action can satisfy this burden at the *prima facie* stage, *see, e.g.*, *Kaytor*, 609 F.3d at 552 ("Close temporal proximity between the plaintiff's protected action and the employer's adverse employment action may in itself be sufficient to establish the requisite causal connection between a protected activity and retaliatory action.").

Accordingly, the Court will assume that Mr. Begin has made out a *prima facie* case of discrimination and proceed to the next step of the *McDonnell Douglas* analysis.

### 2. Pretext

Mr. Begin does not dispute Becton's argument that Mr. Begin's inadequate performance constituted a legitimate, nondiscriminatory reason for his termination. Thus, Mr. Begin must

---

[8] "Where state law is unsettled, [federal courts] are obligated to carefully . . . predict how the state's highest court would resolve the uncertainty or ambiguity." *Chufen Chen v. Dunkin' Brands, Inc.*, 954 F.3d 492, 497 (2d Cir. 2020).

present evidence showing that this reason was a mere pretext for disability discrimination. To survive a motion for summary judgment, Mr. Begin must raise a triable issue of fact as to whether his disability was a "motivating factor" in his termination. *See Wallace v. Caring Sols., LLC*, 213 Conn. App. 605, 626 (2022) (holding that "the proper causation standard [for CFEPA claims] is the motivating factor test").

On the pretext issue, the parties offer the same arguments that they raised with respect to the fourth element of the *prima facie* case. Becton argues that Mr. Begin cannot establish pretext because Mr. Vidal both hired and fired Mr. Begin, because Mr. Begin's negative feedback began soon after he was hired, and because there is no evidence Mr. Begin was treated less favorably than other employees. *See* Mem. at 17–21. In response, Mr. Begin argues that the performance issues cited by Becton were pretextual because Mr. Vidal initially praised Mr. Begin's work and that his criticisms became frequent only after Mr. Begin returned from his first medical leave, because of the temporal proximity between his request for leave and his termination, and because Mr. Begin was criticized for issues outside his control.

The Court agrees with Becton.

Becton argues that it is entitled to a "same-actor" inference because Mr. Vidal made both the decision to hire Mr. Begin and the decision to fire him. *See* Mem. at 17. When the same person makes both of these decisions, the defendant may be entitled to an inference that discrimination was not a motivating factor because "it is difficult to impute to [the decisionmaker] an invidious motivation that would be inconsistent with the decision to hire." *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997). "This is especially so when the firing has occurred only a short time after the hiring." *Id.*

Here, however, Mr. Begin points out that Mr. Vidal may not have appreciated the significance of Mr. Begin's disability at the time Mr. Begin was hired. *See* Opp'n at 14. Although Mr. Vidal likely observed that Mr. Begin was obese at their interview, he could not have been aware that Mr. Begin would request a leave of absence for bariatric surgery several months later. Thus, while it may be difficult to attribute to Mr. Vidal a general bias against individuals with morbid obesity, Mr. Vidal could still have been motivated by Mr. Begin's request for a leave of absence related to his disability.

As noted above, the close temporal proximity between Mr. Begin's request for leave and Mr. Vidal's decision to terminate him may raise an inference of discrimination. But "such an inference can only satisfy [Mr. Begin's] *prima facie* burden." *Bentley*, 935 F.3d at 90. Temporal proximity alone "cannot demonstrate pretext." *Id.*

In addition to the temporal proximity between Mr. Begin's leave request and his termination, Mr. Begin focuses on purported inconsistencies in Mr. Vidal's feedback to Mr. Begin. He notes that Mr. Vidal stated on July 25, 2019, "I was under the impression you were doing well based on the feedback I'm getting!" July 25 E-Mail. But even this isolated piece of positive feedback came in response to an e-mail from Mr. Begin in which he expressed frustration with his training and said that he was "barely treading water." *Id.*

Other than this e-mail—which was sent over three months before Mr. Begin's request for medical leave—Mr. Vidal's feedback towards Mr. Begin was consistently negative. On August 1 and August 22, Mr. Vidal sent e-mails to Mr. Begin to point out urgent concerns with his workspace. *See* Pl.'s SMF ¶ 17 ("Before anything is done Friday morning this needs to be addressed."); *id.* ¶ 18 ("[T]his issues [sic] needs to be addressed ASAP."). On October 8, shortly after Mr. Begin returned from a three-week injury-related leave of absence, Mr. Vidal conducted

Mr. Begin's probationary period review, where Mr. Vidal decided to keep Mr. Begin on probationary status and conduct monthly reviews of his performance. *See id.* ¶¶ 25–26. In this review, Mr. Vidal urged Mr. Begin to "[s]how me the skill you professed at the interview." *See* Ex. I to Vidal Aff., ECF No. 29-4 at 56 ("Probationary Review"). On October 25, Mr. Begin sent Mr. Vidal an e-mail acknowledging that he was struggling with his work. *See* Pl.'s SMF ¶ 27. A few days later, on October 30, Mr. Vidal sent Mr. Begin another e-mail criticizing the organization of Mr. Begin's work area. *See id.* ¶ 28.

All of these instances occurred before Mr. Begin requested leave for his bariatric surgery. They illustrate that Mr. Vidal's negative view of Mr. Begin's performance was consistent over a period of months and did not arise only after Mr. Vidal became aware of Mr. Begin's disability-related leave of absence. One isolated instance of encouragement a couple of months into Mr. Begin's tenure does not negate this trend or imply a discriminatory motive. "Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001); *see also Gonzalez v. NYU Langone Hosps.*, No. 21-2569, 2022 WL 4372199, at *2 (2d Cir. Sept. 22, 2022) ("Given [the plaintiff's] history of performance issues and discipline, temporal proximity, without more, is insufficient to raise an inference of discrimination."); *Lue v. JPMorgan Chase & Co.*, 768 F. App'x 7, 11 (2d Cir. 2019) ("[T]he record shows that defendants' criticisms of [the plaintiff's] communication style and her response to feedback predated her complaints of discrimination. Therefore, in the absence of other evidence of an intent to retaliate, we conclude that the district court properly granted summary judgment.").

Mr. Begin also contends that Mr. Vidal's explanations for his termination were inconsistent because Mr. Begin's job description indicated that it would take twelve months to become proficient. *See* Opp'n at 12; Ex. L to Vidal Aff., ECF No. 29-4 at 38 ("Job Description"). But this notation in the job description's section on training requirements—which indicated only the "*expected* period of time for an associate to be considered proficient" (emphasis in original)—did not prohibit Mr. Vidal from monitoring and assessing Mr. Begin's performance before the twelve-month mark.

In fact, one stated purpose of Becton's ninety-day probationary policy was to "disqualify any associate whose performance does not meet required standards." Ex. D to Vidal Aff., ECF No. 29-4 at 33 ("Probationary Policy"). "While [courts] must ensure that employers do not act in a discriminatory fashion, we do not sit as a super-personnel department that reexamines an entity's business decisions." *Delaney*, 766 F.3d 169 (internal quotation marks omitted). Thus, Mr. Vidal was free to decide that Mr. Begin had not demonstrated sufficient progress in his first eight months to justify waiting another four months. This decision was consistent with Mr. Vidal's negative feedback towards Mr. Begin, both before and after Mr. Begin provided notice of his surgical leave, and it does not demonstrate pretext.

Mr. Begin argues not only that Mr. Vidal's negative feedback was inconsistent with the positive comment he made in July but also that Mr. Vidal's criticisms became more frequent after Mr. Begin's request for bariatric surgery leave. But in support of this claim, he offers only his own unsupported statement, Begin Dep. at 154:8–13, and this statement is belied by the record. After Mr. Begin notified Mr. Vidal of his request for medical leave on November 6, Mr. Vidal conducted Mr. Begin's monthly review on November 8, where he "reiterated several times . . . that Dylan's performance is still below expectation." Pl.'s SMF ¶ 31. Then, on November 18,

17

Mr. Vidal reassigned one of Mr. Begin's duties to another employee. *See id.* ¶ 32. That same day, Mr. Vidal sent an e-mail to human resources staff about terminating Mr. Begin. A couple of weeks later, on December 4, Mr. Vidal conducted Mr. Begin's next scheduled monthly assessment. *See id.* ¶ 35. In summarizing their conversation Mr. Vidal wrote to Mr. Begin that he "did not see the improvement in these areas directly attributed to your input" and "was disappointed in the presentation of the information requested of you." *Id.*

Based on the documentary record submitted to the Court, this post-notice negative feedback was not more frequent than the pre-notice critiques that Mr. Begin received.[9] Mr. Begin stated at his deposition that "no matter what was happening on the floor, I seemed to be getting negative feedback on a regular occurrence with Mike after—definitely after the notification that I was going to go out on a second medical leave." Begin Dep. at 154:8–13. Because the record does not indicate whether Mr. Vidal may have been giving Mr. Begin negative verbal feedback more frequently than the e-mails in the record reflect, this statement might suggest there is a genuine factual dispute as to whether Mr. Vidal criticized Mr. Begin more often after the medical leave notice. But just a few minutes earlier in his deposition, Mr. Begin had stated that the more frequent criticisms began after the October 8 probationary period review, not after the November 6 leave of absence notice. *See id.* at 144:23–145:2 ("Anything negative that Mike had said to me was well after the 90 days, which started to accumulate after this October 8th poor 90-day review. It became a regular occurrence after that with Mike.").

In light of these contradictory statements, Mr. Begin's vague and unsupported assertion that Mr. Vidal's criticism became more frequent only after the medical leave notice is

---

[9] This is particularly true when accounting for the fact that the two monthly reviews on November 8 and December 4 were scheduled at Mr. Begin's October 8 probationary period review, before Mr. Begin's request for medical leave. *See* Pl.'s SMF ¶ 26. The record simply does not show that Mr. Vidal went out of his way to criticize Mr. Begin after the November 6 leave of absence request.

insufficient to raise a triable issue of fact. *See BanxCorp v. Costco Wholesale Corp.*, 978 F.
Supp. 2d 280, 299 (S.D.N.Y. 2013) ("But a self-serving, contradictory affidavit fails to raise a
triable issue of fact when it conflicts with documentary evidence."); *Flaherty v. Coughlin*, 713
F.2d 10, 13 (2d Cir. 1983) (noting that "mere conclusory allegations or denials are insufficient to
withstand a motion for summary judgment once the moving party has set forth a documentary
case" (internal quotations marks omitted)), *overruled on other grounds by Swierkiewicz v.
Sorema N. A.*, 534 U.S. 506, (2002).

It is true that, compared to the pre-notice feedback, the post-notice feedback was in some
ways more serious. Only after Mr. Begin notified Mr. Vidal about his bariatric surgery did Mr.
Vidal make the decision to reassign one of Mr. Begin's duties and to terminate Mr. Begin. *See*
Pl.'s SMF ¶¶ 32–33. But these actions were merely steps in a series of "gradual adverse job
actions began well before the plaintiff had ever engaged in any protected activity." *Slattery*, 248
F.3d at 95. Furthermore, the tone of the earlier critiques was in some ways more severe. On
August 1, Mr. Vidal told Mr. Begin that "[t]here is no explanation that can account for" the state
of one of his presses, and, on August 22, Mr. Vidal wrote that "the parts containment on this
press is not acceptable." Pl.'s SMF ¶¶ 17, 18. This is not a case in which "the tone and frequency
of [the decisionmaker's] negative comments noticeably escalated" after the plaintiff's protected
activity. *Clarke v. N.Y.C. Dep't of Educ.*, No. 18-cv-1850 (NGG) (JO), 2020 WL 6047426, at *8
(E.D.N.Y. Oct. 13, 2020) (holding that ""[a] reasonable juror could conclude that before
December 2015, Principal Christie wrote emails to give Ms. Clarke feedback, while after, she
wrote to document allegations for Ms. Clarke's employment file").

Thus, particularly in light of the consistency between the pre-notice feedback and the
post-notice feedback, the negative feedback that Mr. Begin received from August through

October, "which occurred before the alleged protected activity, is sufficiently significant to sever the causal link between" his disability-related request for leave and his termination. *Hernandez v. N.Y.C. Dep't of Sanitation*, No. 18-cv-1808 (LGS), 2018 WL 5447540, at *4 (S.D.N.Y. Oct. 29, 2018).

Finally, Mr. Begin argues that Becton's decision to terminate him was pretextual because Mr. Vidal criticized Mr. Begin for issues beyond his control. *See* Opp'n at 14–15. But "[m]erely contesting the factual underpinnings of an employer's decision to terminate an employee is insufficient to raise a genuine dispute of material fact about whether the decision was pretextual." *Polk v. Sherwin-Williams Co.*, No. 3:16-cv-1491 (MPS), 2019 WL 1403395, at *10 (D. Conn. Mar. 28, 2019); *see also McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d 211, 216 (2d Cir. 2006) ("In a discrimination case, however, we are decidedly not interested in the truth of the allegations against plaintiff. We are interested in what *motivated* the employer; the factual validity of the underlying imputation against the employee is not at issue." (internal quotation marks and citation omitted)). If Mr. Vidal's criticisms were initially legitimate and Mr. Begin was blamed for issues outside his control only after November 6, a reasonable jury might be able to infer that Mr. Vidal's post-notice critiques were pretextual. Mr. Begin, however, has not made such an argument.

Accordingly, the Court concludes that, after drawing all reasonable inferences in favor of Mr. Begin, he has not raised a genuine question of fact as to whether Becton's stated reason for terminating him was a pretext for disability discrimination or retaliation. The Court will therefore grant Becton's motion for summary judgment as to Mr. Begin's disability discrimination and retaliation claims.

20

### B. Failure to Accommodate

Although CFEPA, unlike the ADA, does not mention accommodations, the Connecticut Supreme Court has held that the CFEPA's nondiscrimination provisions implicitly "require employers to make a reasonable accommodation for an employee's disability." *Curry v. Allan S. Goodman, Inc.*, 286 Conn. 390, 415 (2008). To survive a motion for summary judgment on a reasonable accommodation claim, a plaintiff must produce enough evidence for a reasonable jury to find that "(1) he is disabled within the meaning of the [statute], (2) he was able to perform the essential functions of the job with or without a reasonable accommodation, and (3) [the defendant], despite knowing of [the plaintiff's] disability, did not reasonably accommodate it." *Id.* (alterations in original) (internal quotation marks omitted).

Here, Becton argues that Mr. Begin cannot establish a failure to accommodate claim because he requested only one disability-related accommodation—a leave of absence to have bariatric surgery—and Becton granted this accommodation. *See* Mem. at 22–24.

In response, Mr. Begin argues that Becton effectively denied his requested accommodation because it terminated him immediately upon his return from leave. *See* Opp'n at 17.

The Court disagrees.

Mr. Begin has not presented any evidence showing that Becton formally denied a request for accommodation. And as this Court has recognized in the FMLA context, Mr. Begin's "theory of interference by termination is merely a retaliation theory in disguise." *Blake v. Recovery Network of Programs, Inc.*, No. 3:22-cv-19 (VAB), 2023 WL 1930169, at *7 (D. Conn. Feb. 10, 2023) (internal quotation marks omitted). As the Court has already explained, Mr. Begin has not put forth sufficient evidence to survive summary judgment on his retaliation claim.

Accordingly, the Court will grant Becton's motion for summary judgment on Mr. Begin's failure to accommodate claim.

**IV.     CONCLUSION**

For the foregoing reasons, Becton's motion for summary judgment is **GRANTED**.

The Clerk of Court is respectfully directed to enter judgment in favor of Becton and to close this case.

**SO ORDERED** at Bridgeport, Connecticut, this 11th day of August, 2023.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE